IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SPEROS A. BATISTATOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *vs.* | ) | |
| | ) | |
| LAKE COUNTY CONVENTION AND | ) | |
| VISITORS BUREAU d/b/a SOUTH | ) | |
| SHORE CONVENTION AND VISITORS | ) | |
| AUTHORITY; THE CITY OF | ) | |
| HAMMOND; LEFT OF CENTER MEDIA, | ) | |
| LLC; THOMAS M. MCDERMOTT, JR., in | ) | Cause No. 2:22-cv-254 |
| his official and individual capacity; KEVIN C. | ) | |
| SMITH, in his official and individual capacity; | ) | |
| BRENT BRASHIER, in his official and | ) | |
| individual capacity; MATTHEW | ) | |
| MALONEY, in his official and individual | ) | |
| capacity; ANDREW E. QUNELL, in his | ) | |
| official and individual capacity; THOMAS P. | ) | |
| DABERTIN, in his official and individual | ) | |
| Capacity; and MATTHEW M. SCHUFFERT, | ) | |
| in his official and individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY

Plaintiff Speros A. Batistatos, by counsel, for his *Complaint for Damages and Demand for Trial by Jury*, states as follows:

## I.    INTRODUCTION

1.    This is an action brought by Speros A. Batistatos ("Mr. Batistatos") against Defendant Lake County Convention and Visitors Bureau d/b/a South Shore Convention and Visitors Authority ("SSCVA"), between which parties there was an employment relationship. The SSCVA violated the Age Discrimination in Employment Act of 1967, 29

U.S.C. § 621, *et seq.* ("ADEA"), by terminating Mr. Batistatos's employment. The SSCVA acted deliberately and violated the civil rights of Mr. Batistatos on the basis of his age, which was 58 at the time of the SSCVA's termination of his employment.

2.      Further, the SSCVA breached its June 23, 2016 Employment Agreement with Mr. Batistatos ("Employment Agreement") by failing to abide by the terms of Mr. Batistatos's Employment Agreement and violated the duty of good faith and fair dealing by imposing an early termination of Mr. Batistatos's employment in bad faith.

3.      The SSCVA; Brent Brashier, in his official and individual capacity; Matthew Maloney, in his official and individual capacity; Andrew E. Qunell, in his official and individual capacity; Thomas P. Dabertin, in his official and individual capacity; and Matthew M. Schuffert, in his official and individual capacity, also violated the First Amendment of the United States Constitution and/or the Indiana whistleblower statute by retaliating against Mr. Batistatos after he raised concerns to the Board about the SSCVA's violations of a federal law or regulation, a state law or rule, and the misuse of public resources.

4.      This is also an action brought by Mr. Batistatos against The City of Hammond; Thomas M. McDermott, Jr., in his official and individual capacity; and Kevin C. Smith, in his official and individual capacity (collectively, "Hammond Defendants") based on their tortious interference with Mr. Batistatos's Employment Agreement with the SSCVA and prospective business relationship with the SSCVA by proposing and agreeing to exchange the SSCVA's termination of Mr. Batistatos's employment for the City of Hammond's dismissal of a lawsuit against the SSCVA.

5.      This action further includes an action for the unfounded and defamatory statements by the City of Hammond; Left of Center Media, LLC; Thomas M. McDermott, Jr.; and Kevin C. Smith about Mr. Batistatos on Mr. McDermott's and Mr. Smith's podcast, which caused significant damage to Mr. Batistatos's reputation and job prospects.

## II.      EEOC COMPLIANCE

6.      Mr. Batistatos exhausted all of the administrative proceedings available to him by timely filing a Charge of Discrimination on the basis of age with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.      Mr. Batistatos filed his Charge of Discrimination with the EEOC on or about November 16, 2021.

8.      Mr. Batistatos's Charge of Discrimination against SSCVA was filed by the EEOC under Charge Number 470-2022-00752. A true and accurate copy of Mr. Batistatos's Charge is attached hereto and marked as Exhibit 1.

9.      Mr. Batistatos's Charge was timely filed in compliance with 29 U.S.C. § 626, 42 U.S.C. § 12117 and 42 U.S.C. § 2000e-5.

10.     Mr. Batistatos received a Dismissal and Notice of Rights for this Charge on May 29, 2022, which was dated May 29, 2022. A true and accurate copy of the Dismissal and Notice of Rights is attached hereto and marked as Exhibit 2.

11.     Mr. Batistatos's age discrimination claim was therefore timely filed within ninety (90) days of receipt by Mr. Batistatos of the Dismissal and Notice of Rights.

### III.    TORT CLAIM NOTICES

12.    On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for defamation per se, defamation per quod, tortious interference with Mr. Batistatos's business and contractual relationships, and other claims to Defendant Kevin C. Smith, Corporation Counsel for the City of Hammond; the members of the City of Hammond Common Council, and the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

13.    On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for a breach of the duty of good faith and fair dealing, breach of Mr. Batistatos's employment contract; tortious interference with Mr. Batistatos's business and contractual relationships; and retaliation for being a whistleblower under Indiana law as well as a violation of Section 1983 and other claims to Brent Brashier, Vice Chairman for the Lake County Convention & Visitors Bureau d/b/a South Shore Convention and Visitors Authority as well as the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

14.    On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for retaliation for being a whistleblower under Indiana law, wrongful termination of Mr. Batistatos's employment, and other claims to Tom Dabertin, Board Member of the Lake County Convention & Visitors Bureau d/b/a South

4

Shore Convention and Visitors Authority as well as the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

15.     On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for defamation per se, defamation per quod, and tortious interference with Mr. Batistatos's business and contractual relationships as well as a violation of Section 1983 and other claims to Matthew Maloney, Treasurer of the Lake County Convention & Visitors Bureau d/b/a South Shore Convention and Visitors Authority as well as the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

16.     On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for defamation per se, defamation per quod, tortious interference with Mr. Batistatos's business and contractual relationships, and other claims to Defendant Thomas M. McDermott, Jr., Mayor of the City of Hammond; the members of the City of Hammond Common Council, and the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

17.     On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for a breach of the duty of good faith and fair dealing, breach of Mr. Batistatos's employment contract; tortious interference with Mr. Batistatos's business and contractual relationships; and retaliation for being a whistleblower

5

under Indiana law, and other claims to Andy Qunell, Chairman of the Board for the Lake County Convention & Visitors Bureau d/b/a South Shore Convention and Visitors Authority as well as the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

18.    On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for a breach of the duty of good faith and fair dealing, breach of Mr. Batistatos's employment contract; tortious interference with Mr. Batistatos's business and contractual relationships; and retaliation for being a whistleblower under Indiana law, and other claims to Matt Schuffert, Board Member of the Lake County Convention & Visitors Bureau d/b/a South Shore Convention and Visitors Authority as well as the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

19.    On November 16, 2021, Mr. Batistatos sent a *Request for Review, Request for Investigation, and Notice of Claim to Preserve Legal Rights and Remedies* (a "tort claim notice") regarding Mr. Batistatos's state law claims for a breach of the duty of good faith and fair dealing; breach of Mr. Batistatos's employment contract; tortious interference with Mr. Batistatos's business and contractual relationships; and retaliation for being a whistleblower under Indiana law as well as a violation of Section 1983 and other claims to the Lake County Convention & Visitors Bureau d/b/a South Shore Convention and Visitors Authority; all board members of the Lake County Convention & Visitors Bureau d/b/a South Shore

6

Convention and Visitors Authority; and the Indiana Political Subdivision Risk Management Commission. This tort claim notice was served by certified mail.

20.    Mr. Batistatos only received a response to these notices of tort claims from the Indiana Political Subdivision Risk Management Commission on December 1, 2021, which acknowledged receipt of the notices and stated that Lake County was "not a member(s) of the Indiana Political Subdivision Risk Management Commission Fund." Thus, "no monies are available through the fund to assist you in your claim."

21.    The Indiana Political Subdivision Risk Management Commission further noted that Mr. Batistatos had complied with the requirement to serve tort claims on the Indiana Political Subdivision Risk Management Commission, and the "notice shall serve as proof of [Mr. Batistatos's] compliance with this requirement."

## IV.    JURISDICTION

22.    Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1343, and 1367.

23.    The ADEA claim is authorized and instituted pursuant to Section 7(c) of the ADEA, 29 U.S.C. § 626(c).

24.    Jurisdiction to grant injunctive and declaratory equitable relief as well as to award damages is invoked pursuant to 29 U.S.C. § 626(c)(1).

25.    The Section 1983 claim is authorized and instituted pursuant to 42 U.S.C § 1983.

26.    The breach of contract claim and other state law claims are authorized and instituted pursuant to 28 U.S.C. § 1367.

7

27. The employment practices alleged to be unlawful as well as the breach of contract and other tortious acts were committed within the jurisdiction of the United States District Court for the Northern District of Indiana, Hammond Division.

## V. VENUE

28. Mr. Batistatos is a resident of Lake County in the State of Indiana and is a citizen of the United States of America.

29. Defendant Lake County Convention and Visitors Bureau d/b/a "South Shore Convention and Visitors Authority" ("SSCVA") is located in Lake County, Indiana.

30. Defendant City of Hammond is located in Lake County, Indiana.

31. Left Of Center Media, LLC is a limited liability company that is organized in the State of Indiana. Lake County, Indiana is its principal place of business.

32. Thomas M. McDermott, Jr. works in Lake County, Indiana, and is the current Mayor of Defendant City of Hammond.

33. Kevin C. Smith works in Lake County, Indiana, and is the current Corporation Counsel for Defendant City of Hammond.

34. Brent Brashier is the current Vice Chairman for the SSCVA, who works for the SSCVA in Lake County, Indiana.

35. Matthew Maloney is the current Treasurer for the SSCVA, who works for the SSCVA in Lake County, Indiana.

36. Andrew E. Qunell is the current Chairman of the Board for the SSCVA, who works for the SSCVA in Lake County, Indiana.

37.    Thomas P. Dabertin is a current Board member for the SSCVA, who works for the SSCVA in Lake County, Indiana.

38.    Matthew M. Schuffert is a current Board member for the SSCVA, who works for the SSCVA in Lake County, Indiana.

39.    The unlawful employment practices alleged herein primarily arose in Hammond, Indiana, which is located within Lake County, Indiana. Lake County is located in the Northern District of Indiana.

40.    Thus, this cause of action is properly venued in the Northern District of Indiana under 28 U.S.C. § 1391(b), which allows for an action to be brought in the district where the defendant resides or in which the cause of action arose.

## VI.    PLAINTIFF

41.    Mr. Batistatos is a citizen of the United States, and is currently, as he was during all times relevant to this Complaint, a resident of Lake County in the State of Indiana.

42.    Mr. Batistatos resides in St. John, Indiana.

43.    Mr. Batistatos was born in 1963 and is 59 years old.

44.    Mr. Batistatos is a person entitled to protection under the ADEA.

## VII.    DEFENDANTS

45.    Defendant Lake County Convention and Visitors Bureau d/b/a "South Shore Convention and Visitors Authority" is located at 7770 Corinne Drive, Hammond, Indiana 46323.

46.    At all times relevant to this action, SSCVA employed Mr. Batistatos.

47. Defendant City of Hammond is located at 5925 Calumet Avenue, Hammond, Indiana 46320.

48. Defendant Left Of Center Media, LLC is a limited liability company with its principal place of business located at 9301 Calumet Ave., 2F, Munster, Indiana 46321.

49. Thomas M. McDermott, Jr. resides in Hammond, Indiana and at all times relevant engaged in the performance of his duties within Lake County, Indiana.

50. Kevin C. Smith resides in Hammond, Indiana and at all times relevant engaged in the performance of his duties within Lake County, Indiana.

51. Brent Brashier resides in Munster, Indiana and at all times relevant engaged in the performance of his duties for the SSCVA within Lake County, Indiana.

52. Matthew Maloney resides in Munster, Indiana and at all times relevant engaged in the performance of his duties for the SSCVA within Lake County, Indiana.

53. Andrew E. Qunell resides in Munster, Indiana and at all times relevant engaged in the performance of his duties for the SSCVA within Lake County, Indiana.

54. Thomas P. Dabertin resides in Whiting, Indiana and at all times relevant engaged in the performance of his duties for the SSCVA within Lake County, Indiana.

55. Matthew M. Schuffert resides in Hobart, Indiana and at all times relevant engaged in the performance of his duties for the SSCVA within Lake County, Indiana.

## VIII. STATEMENT OF FACTS

### A. Mr. Batistatos was a loyal and dependable SSCVA employee, who performed exceptionally well for more than 3 decades.

56. The SSCVA originally hired Mr. Batistatos in March of 1989 as Executive Director. Mr. Batistatos served in this position until 1993 when he became President and CEO.

57. Mr. Batistatos served as President and CEO until the year 2000, when he took a hiatus to pursue other career goals.

58. In 2005, the SSCVA reached out to Mr. Batistatos to persuade him to return to the SSCVA.

59. From 2005 to 2021, Mr. Batistatos held the position of President and CEO of the SSCVA.

60. In his capacity as President and CEO, Mr. Batistatos performed exceptionally well in bringing tourism and activities to the area, as well as providing the SSCVA and its surrounding counties with funds to continue to promote and host events for their customers, tourists, and visitors.

**B. Mr. Batistatos's Employment Agreement was scheduled to expire in December 2021, but an outside attorney was engaged, and a Board committee was formed to renegotiate Mr. Batistatos's Employment Agreement.**

61. Mr. Batistatos's Employment Agreement was scheduled to expire on December 31, 2021.

62. However, on January 21, 2021, the Board, led by Chairman Mr. Andy Qunell, engaged an outside attorney to renegotiate Mr. Batistatos's Employment Agreement.

63. The Board also formed a Compensation Committee chaired by Matt Schuffert to assist in the renegotiation.

64.     The Compensation Committee met numerous times beginning in February of 2021 until May of 2021 for that purpose.

65.     Several times, Mr. Batistatos also discussed with Matt Schuffert the Committee's work on the Employment Agreement.

66.     Mr. Batistatos advised the Compensation Committee and select members of the Board that he wanted to work four and half more years before retiring.

67.     On May 20, 2021, the conclusion of an Executive Session advertised to discuss his employment agreement. Mr. Batistatos was told that he would get a draft of the new employment agreement before the end of the year.

68.     The efforts to renegotiate Mr. Batistatos's Employment Agreement ceased in June of 2021, and Mr. Batistatos was relieved of his duties as President and CEO on July 15, 2021.

69.     Compensation and benefits that he was entitled to receive under his contract were not paid.

70.     The Board also refused to port Mr. Batistatos's personal phone number to him as contemplated under his employment contract.

71.     The Board then told Mr. Batistatos that he was not under consideration to continue as President and CEO after December 31, 2021.

**C.     Mr. Batistatos reported to the Board that it had violated multiple laws.**

72.     During the efforts to renegotiate Mr. Batistatos's Employment Agreement, specifically on February 1, 2021, the SSCVA received approximately $388,500.00 in federal Paycheck Protection Program ("PPP") funds.

73.     In accordance with the law, 60% of the PPP funds must be used for payroll and the remaining 40% for various overhead expenses.

74.     Numerous COVID-19 Finance Meetings occurred subsequently, including on February 16, 2021; March 16, 2021; April 13, 2021; and May 18, 2021. However, during these meetings, no discussion was initiated by the Board about the SSCVA's needs or thoughts on how to spend reserves of cash.

75.     On May 20, 2021, in Executive Session, the SSCVA's Board of Directors illegally discussed "no strings attached" grants of $25,000 each to 15 municipalities. The SSCVA explained that it should "give those monies out" since the SSCVA received almost $400,000 in PPP funds.

76.      On May 20, 2021, during the public meeting that followed, after much discussion among the CEO and Board, the majority of the SSCVA's Board voted to spend $400,000 in these "no strings attached" grants.

77.     Andrew Kyres, Parliamentarian, ruled that the motion was out of order and suggested that a legal opinion be obtained.

78.     James Magrames, the Board's attorney, was then instructed to prepare a legal opinion for the SSCVA's Board of Directors.

79.     Mr. Brashier created a working committee to determine the details of the grant program.

80.     Mr. Batistatos informed the SSCVA's Board that this Executive Session had violated the Open Door Law. Ind. Code § 5-14-1.5-1.

81.     On May 21, 2021, Mr. Brashier sent a communication to the newly formed grant committee, which excluded Mr. Batistatos, the President/CEO of the SSCVA.

82.     Ms. Holderby then requested a meeting on May 25, 2021 with the grant committee.

83.     On May 24, 2021, Mr. Qunell contradicted previous statements by stating, "I have just received 3 opinions to move ahead[.] [T]hey completely disagree. So we will be holding the meeting on Thursday. The remedy for the violation if any, would be the meeting on the 27th."

84.     On May 25, 2021, a meeting between the grant committee and Mr. Batistatos, Ms. Holderby, and Cathy Svetanoff, Chief Financial Officer of the SSCVA occurred. During this meeting, the grant committee was reminded that, under the relevant bylaws, the SSCVA's Board of Directors were prohibited from conducting a committee meeting without the presence of the CEO.

85.     The grant committee decided that $300,000 would be directed to municipalities, which must—at the insistence of the CEO—apply in writing and advise the SSCVA of the grant's intended uses.

86.     Minimal discussions on administering these grants and monitoring these grants occurred.

87.     The SSCVA's CEO and other management and staff continued to advocate for more transparency and documentation to protect the SSCVA with the State legislature and the State Board of Accounts.

88.    On May 27, 2021, during a special meeting of the SSCVA's Board of Directors, the reporting and minutes for the actions taken on May 20, 2021 during the Executive Session were approved.

89.    Mr. Magrames advised, on the record, that he had asked that the May 27, 2021 special meeting not occur until he concluded his research on the appropriateness of the use of the monies.

90.    A motion was then immediately brought to hire independent counsel for a legal opinion, which passed. There was no mechanism for vetting outside counsel.

91.    On May 28, 2021, Mr. Qunell, Mr. Brashier, and Mr. Maloney engaged in a public speaking and media campaign to advertise to municipalities the availability of the "free federal money."

92.    Mr. Brashier stated, "[W]e have federal funds we can get to the local municipalities to bring people out to enjoy festivals and fireworks. Tourism dollars are great for communities because people come, spend money and leave without being a burden to the services . . . we're not going to nitpick. We want to get these monies to communities ASAP."

93.    On June 3, 2021, Mr. Qunell summoned Gene Pinkus—the founding partner for Mr. Magrames's law firm Kopa Pinkus Dolin ("KPD")—for an off-site, after hours meeting. Mr. Qunell complained to Mr. Pinkus about Mr. Magrames's opinion being wrong and taking too much time to research. Mr. Qunell then offered Mr. Pinkus—on behalf of his firm KPD—the opportunity to resign from serving as the Board's counsel to "save face." Mr. Qunell further offered Mr. Magrames the opportunity to stay on as litigation counsel

and to continue with the lawsuit brought by Mayor McDermott and the City of Hammond against the SSCVA.

94.     On June 4, 2021, Mr. Pinkus called Mr. Batistatos to advise him that KPD was pressured to resign and that although KPD was no longer representing the SSCVA, Mr. Qunell had offered KPD the opportunity to stay on as "litigation" counsel.

95.     Shortly thereafter, Mr. Qunell advised Mr. Batistatos that KPD "resigned."

96.     On June 10, 2021, Mr. Qunell, on behalf of Mr. Brashier, made a presentation to the Dyer Town Council/Redevelopment Commission. Mr. Qunell stated, during a recorded public meeting, that "we [the SSCVA] were the beneficiary of a grant that came from the government, and I hate to say it this way, but we didn't need it."

97.     On June 15, 2021, multiple SSCVA Board Members attended a conference call with Mr. Pinkus and Mr. Magrames and were advised of the details of June 3, 2021 meeting with Mr. Qunell.

98.     At its regular monthly meeting on June 17, 2021, some of the SSCVA Board members discussed the removal of KPD and Mr. Magrames without those Board members having any prior knowledge. Mr. Qunell claimed that Mr. Pinkus willingly resigned on behalf of KPD.

99.      When the minutes for the regular May 20, 2021 meeting of the SSCVA Board and the special May 27, 2021 meeting were presented, Mr. Qunell immediately questioned the May 20, 2021 minutes, claiming no motion to seek a legal opinion was ever made.

100.    Mr. Batistatos disputed this contention, and Mr. Dabertin motioned to table the discussion, and the motion to approve these minutes was tabled.

101.    The minutes of the special meeting were approved, which contained the comments from Mr. Magrames, including that he had not completed his research, and he asked for a postponement of the meeting.

102.    Mr. Batistatos pointed out that the SSCVA would not have received a bill for Mr. Magrames's legal research and opinion if the SSCVA's Board of Directors had not authorized such action in the May 20, 2021 meeting. No further questions on this matter were allowed.

103.    On June 18, 2021, a reporter from the *Post Tribune*, Carrie Napoleon, sent the SSCVA a public records request.

104.    On June 21, 2021, Mr. Qunell, in response to Ms. Napoleon's public records request, released the May 25, 2021 memorandum by Mr. Magrames, which had not been distributed to all of the SSCVA's Board members or the SSCVA's executive staff, as required by the bylaws.

105.    Mr. Magrames's May 25, 2021 memorandum concluded that a potential violation of the Open Door Law had occurred during the meeting on May 20, 2021. Mr. Magrames further stated as follows:

> I recommend canceling the special meeting scheduled for Thursday, May 27, 2021, or at the least, dropping the topic of the PPP loan disbursement from the agenda. I further recommend adding the PPP loan disbursement issue to the agenda for the regular board meeting on June 17, 2021, for further discussion and possible approval by the board. This will also provide me the opportunity to conduct further research into the validity of the disbursements in the manner contemplated by the board. I have concerns with the ramifications such disbursements might have with the use of public funds which would be subject to oversight by the State Board of Accounts. I believe it is vital to explore the extent of any protection required to show full compliance of use of the PPP loan, in addition to supporting documentation to satisfy the State Board of Accounts audit process.

17

106. The SSCVA's Board of Directors had therefore approved the allocation of grant monies without any knowledge of Mr. Magrames's legal opinion during the May 27, 2021 Special Meeting.

107. At Mr. Batistatos's insistence, the Board later included criteria for the municipalities to receive the grants, but the Board still publicly stated in various forms of media on numerous occasions that the grants were disbursed because of the receipt of PPP monies.

108. On June 22, 2021, the *Post Tribunes*'s story ran on the public meeting of the SSCVA's Board held on June 17, 2021, which related to KPD's resignation.

109. In addition to violating the Indiana Open Door law, this disbursement of PPP funds also violated the CARES Act and related federal legislation.

110. Mr. Batistatos outlined his concerns with these unlawful actions by the SSCVA's Board and the SSCVA in a June 24, 2021, email to all of the SSCVA's Board members. Mr. Batistatos noted that he was "compelled to contact government authorities to initiate inquiries and/or investigations into possible board/officer misconduct, malfeasance and potential criminal activity."

**D. Mr. McDermott stated publicly that he would drop a lawsuit against the SSCVA if the Board fired Mr. Batistatos, and the Board stopped negotiating to renew Mr. Batistatos's employment agreement.**

111. On June 25, 2021, the Mayor of the City of Hammond—Defendant Thomas McDermott Jr.—one of the potential grantees, stated publicly that he would drop a lawsuit against SSCVA if the Board fired Mr. Batistatos.

112.    In an exchange on June 22, 2021 between Mr. Batistatos and Mr. McDermott, Mr. McDermott stated, "I was going to get you even worse, but I'm happy with what we got" apparently in reference to the Board's distribution of the PPP money.

113.    In response to Mr. Batistatos's email, Defendant Thomas P. Dabertin, a member of the SSCVA's Board, wrote in an email that he believed it was "time for change" regarding Mr. Batistatos's position with the SSCVA. Defendant Matthew M. Schuffert asked, in a response within the same email chain, "what authorities" had been contacted.

114.    This was in direct retaliation for Mr. Batistatos's raising his concerns about the illegality of the Board's actions.

115.    The SSCVA Board then stopped negotiating to renew Mr. Batistatos's Employment Agreement and relieved Mr. Batistatos of his duties as President and CEO of SSCVA on July 15, 2021, well before the expiration of Mr. Batistatos's Employment Agreement.

116.    The Board thus terminated Mr. Batistatos's employment.

117.    There was no cause for Mr. Batistatos's early termination, as required by the Employment Agreement.

118.    The SSCVA did not attempt to resolve these disputes with Mr. Batistatos either by mediation or arbitration.

119.    After the PPP funds were disbursed and Mr. Batistatos's employment was effectively terminated, Mr. McDermott dismissed his lawsuit against the SSCVA.

120.    Mr. Batistatos's replacement as the SSCVA's President and CEO was more than 10 years younger than him.

E.      **Mr. McDermott publicly made untruthful and disparaging statements about Mr. Batistatos on the Left of Center Podcast.**

121.    Mr. McDermott made numerous defamatory and disparaging statements and engaged in tirades against Mr. Batistatos on the podcast titled Left of Center Podcast ("LOCPOD") with Defendant and Corporation Counsel for the City of Hammond Kevin C. Smith.

122.    LOCPOD is owned by Defendant Left of Center Media, LLC. Mr. McDermott and Mr. Smith are members of the Left of Center Media, LLC.

123.    On the episode that aired on June 25, 2021, Mr. McDermott falsely accused Mr. Batistatos of "wield[ing] tax money like a weapon":

> The thing about this guy is…this gentleman is just like punish, he's sort of like old school politician….He's not elected. He's appointed by this 19-member board, and he wields tax money like a weapon. And, if you're one of his guys, one of his people he likes, he will throw this money at you and help your community out, and if he does not like you at all, like Hammond, like Mayor Tom, we get nothing.

124.    Mr. McDermott and Mr. Smith even falsely implied that Mr. Batistatos committed a crime or participated in illegal activity:

> Mr. McDermott: "Well, we filed a lawsuit against them last year, but we're getting into the weeds. We've been at war with this agency for the better part of a decade, right? And, I pulled FOIA requests because he's a public employee, and then I pulled a FOIA request for all the people, the top like 20 people, that work for the agency, and I'd drop it publicly without their names. I'd be like, hey, did you realize Speros's number two person makes like 200 grand a year? Did you realize Speros made 330 grand a year? Just shocking people with the amount of waste, fraud, and abuse that's going on at the [SSCVA] under Speros's watch. And, this stuff is just fodder for the newspaper. They didn't realize all this stuff was happening."
>
> Mr. Smith: "I don't think the Board knew."
>
> Mr. McDermott: "No. And, the Board commissioned a study, and the study says he does make $330,000  a year, which is freaking outrageous. This is

20

taxpayer money that's freaking outrageous, and he basically did it on the sly. You know? I'm not saying there's illegal stuff happening, but . . . . It's shady as hell. How about that? It's not illegal. It's shady as hell."

125.    Multiple times, Mr. McDermott falsely stated that Mr. Batistatos created his own rules or selected his own boss as follows:

"He made up his own rules."

"He's picking his own boss."

"Speros put his boss on there."

126.    Mr. McDermott falsely accused Mr. Batistatos of facilitating some type of conspiracy:

We have a lawsuit filed with the [SSCVA], with the State, but it was originally filed against them, and it was because of the jackass behavior of the CEO because he was ignorant of the law and he was a punk about it . . . . He made up his own rules . . . . He's picking his own boss . . . . If I control all my Board members on there, and they're all part of the conspiracy with me, then I can make 330 grand on the down low, which his outrageous money . . . . It's all like bullshit backend deals . . . . This guy doesn't care. A pompous want to be elected official, and he deserves everything that is coming his way right now.

127.    On the episode that aired on June 29, 2021, Mr. McDermott falsely compared Mr. Batistatos's salary to his own by using false information:

This is comparing his salary to a mayor's, which is interesting because I run a city of 81,000 people. I mean our budget, we have $100 million plus. 1,000 employees… It's the most complex job you can imagine . . . . I get paid $130,000 year. I'm not complaining, but when I look at the guy that's in charge of festivals, and he makes two and a half times my salary, and we're both government employees, it's like what's the hell that's so special about this position where his job pays 2 and half more times two and a half more times than the mayor of Hammond and the mayor of Gary, one of the toughest jobs in politics?

128.    Mr. McDermott also falsely disparaged Mr. Batistatos's job performance. For example, Mr. McDermott stated as follows about Mr. Batistatos:

21

You're in charge of marketing the region. So you look at like Twitter followers. I have more Twitter followers than [SSCVA]. I have more Facebook followers than [SSCVA]. My Facebook, my social media pages gets more hits than theirs does. And that's a joke . . . . I'm a mayor of a small part of a small part of our county, and my social media is seen as way more active than his.

I do more as mayor at a $130,000 salary than this guy does in this job all together. And his job is to promote the region.

129.    Numerous times Mr. McDermott falsely stated Mr. Batistatos's salary despite

corrections by Mr. Smith:

"If you ever decide you don't want to own a business anymore, and you want to get into a well-paying career? . . . . I would suggest becoming the CEO of the South Shore Convention and Visitors Bureau. $330,000. Pretty solid salary."

"Yeah. Don't be leaking my $330,000 salary to the media. It's very unfortunate when that happens because then the public knows."

130.    Mr. McDermott also mischaracterized his interactions with Mr. Batistatos:

So, when we're like, hey Speros, we have a festival with 100,0000 people coming here, can you throw us a couple shekels of our money, our tax money that went to your budget because people stay in our hotels. We have tons of hotels. Give us a couple of bucks back so we could bring Sammy Hagar here. And, he's like, 'no, if you won't let me speak on the stage. No. Screw you, Mayor McDermott.

131.    Mr. McDermott and Mr. Smith falsely stated that Mr. Batistatos just made up

the law to benefit himself:

Mr. Smith: "So, statutorily, he doesn't pick the Board. The Board is appointed by every city and town in Lake County."

Mr. McDermott: "But…"

Mr. Smith: "In the past, there has been issues where if a deadline was missed…. Speros, ah…."

Mr. McDermott: "He made up the law."

Mr. Smith: "He interpreted the law to be something different in which he was able to replace that person with somebody else."

Mr. McDermott: "Basically his own choice."

132.    Mr. McDermott falsely claimed that Mr. Batistatos spends taxpayer money as Mr. Batistatos sees fit:

You know, the thing is like he takes credit, and he gets… so when people stay at hotels in Hammond, and they stay the night, there's a fee that they pay. A tax . . . . Innkeepers tax. It goes right into his budget . . . .

So, this guy is not elected. Tax money flows right into his coffers, and he uses it as he sees fit. Not in the best interests of the region. He spends money in Porter County. He spends money in LaPorte County. He spends money in Pulaski and Newton Counties. He's throwing money everywhere. And I'm like, 'hey Speros, we have 100,000 people coming to Hammond for the festival,' and he's like, 'screw you. You won't let me speak on a microphone. And then, by the way, not only that every year when he has his Christmas party and this is, I'm not complaining, but I wouldn't go anyway, he never sends an invitation to me. I'm the only elected official . . . . I never do [get invited], which is fine. He doesn't want me there. But what I'm saying is, the guy, I'm the largest mayor in Northern Indiana, I'm the largest mayor in his district, and he won't even invite the largest mayor to his Christmas party out of spite because I dare question him. I say, 'what you're doing is illegal,' and he's like, 'oh, you're not coming to the Christmas party now, Mayor.' He's a piece of crap, man. He's a petty piece of crap. He really is.

133.    Mr. McDermott and Mr. Smith discussed these remarks on the LOCPOD again on November 19, 2021 and doubled down on each of the remarks they previously made in other episodes of his podcast.

134.    Mr. McDermott further made the following false statements about Mr. Batistatos:

"He made up the law."

"He distributes that money based on how he feels. And his Board. But he's the Executive Director. Speros is spending taxpayer money at his whim along with his Board. . . ."

23

"He basically packed a board full of people that would approve his salary . . . ."

"Kevin, we pulled his credit card records. He would spend $25,000 in one month."

"And he did make up the law, which is why we filed our lawsuit, and his lawyers admitted he broke the law when they entered into the consent decree with us."

"He spent thousands of dollars at steak houses. He spent $20,000 on a credit card bill in one month, and then he followed up the next month and spends $15,000. That's outrageous, Kevin. . . . He's wasting taxpayer money at Ruth's Chris spending $6,000 on one meal. How many $200, $300 bottle of wines did that include? . . . . I have to buy $300, $400 bottles of wine and buy 'em $100 steak to court their vote."

135.    Mr. Batistatos's reputation was significantly damaged by these remarks.

136.    As a direct and proximate result of the foregoing conduct:

a.    Mr. Batistatos has suffered damage to his career;

b.    Mr. Batistatos has suffered mental and physical anguish; and

c.    Mr. Batistatos has incurred additional financial losses, including the costs associated with invoking his federally protected civil rights.

## IX.    STATEMENT OF CLAIMS

### COUNT I
*(Discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.)*

137.    Mr. Batistatos incorporates the allegations of paragraphs 1 through 136 above and, in addition, states that Defendant SSCVA discriminated against him because of his age.

138.    The SSCVA is engaged in an industry affecting commerce, as defined in Section 11(h) of the ADEA, 29 U.S.C. § 630(h).

139.    The SSCVA has employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding year.

24

140. The SSCVA is an "employer" within the meaning of Section 11(b) of the ADEA, 29 U.S.C. § 630(b).

141. Mr. Batistatos was 58 years of age at the time that the SSCVA terminated his employment.

142. During his employment, Mr. Batistatos met his employer's legitimate work expectations.

143. Indeed, Mr. Batistatos had excellent performance reviews leading into 2021, and the SSCVA's Board was in talks to renegotiate a new contract for Mr. Batistatos in 2021.

144. At all times relevant herein, Mr. Batistatos had the requisite skill, experience, education, and other job-related requirements of the position that he held with the SSCVA.

145. The SSCVA's termination of Mr. Batistatos's employment was an adverse employment action taken against Mr. Batistatos because of his age. While other factors contributed to the termination of Mr. Batistatos' employment, he would not have been terminated but for his age.

146. The SSCVA replaced Mr. Batistatos with someone who was more than 10 years younger than him.

147. As a result of the SSCVA's discriminatory actions, Mr. Batistatos has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until the Court grants relief.

### COUNT II
*(Retaliation in Violation of the First Amendment under 42 U.S.C. § 1983)*

148. Mr. Batistatos incorporates the allegations of paragraphs 1 through 147 above and, in addition, states that Defendants the SSCVA, Brent Brashier, Matthew Maloney,

Andrew E. Qunell, Thomas P. Dabertin, and Matthew M. Schuffert retaliated against Mr. Batistatos in violation of Section 1983.

149. Mr. Batistatos engaged in protected activity when he reported the Board's violation of the CARES Act and related federal legislation as well as the Open Door Law to all of the Board members.

150. The violation of federal and state legislation as well as the misuse of public resources are of political, social, and other concern to the community and was a subject of legitimate news interest of value and concern to the public.

151. This report was thus an issue of public concern.

152. Mr. Batistatos made this report as a private citizen rather than as part of his official job duties with the SSCVA.

153. Defendants SSCVA, Brent Brashier, Matthew Maloney, Andrew E. Qunell, Thomas P. Dabertin, and Matthew M. Schuffert infringed on Mr. Batistatos's First Amendment right to free speech when it retaliated against him because he reported these matters of public concern.

154. Specifically, Defendants the SSCVA, Brent Brashier, Matthew Maloney, Andrew E. Qunell, Thomas P. Dabertin, and Matthew M. Schuffert stopped negotiations for Mr. Batistatos's new employment agreement and terminated his employment in violation of the terms of Mr. Batistatos's Employment Agreement.

155. As a result of these retaliatory actions, Mr. Batistatos has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until the Court grants relief.

## COUNT III
*(Breach of Contract)*

156. Mr. Batistatos incorporates the allegations of paragraphs 1 through 155 above and, in addition, states that the SSCVA breached its contract with Mr. Batistatos when it terminated Mr. Batistatos's employment without cause and without any attempts at dispute resolution.

157. Mr. Batistatos had a valid Employment Agreement with the SSCVA for a term that was to expire on December 31, 2021.

158. The SSCVA breached its contract with Mr. Batistatos when it wrongfully terminated Mr. Batistatos's employment in July 2021 without cause.

159. The SSCVA never attempted any dispute resolution as provided for under the Employment Agreement.

160. As a result of the SSCVA's breaches, Mr. Batistatos has suffered and will continue to suffer damages.

161. Any attempt by Mr. Batistatos to resolve the termination of Mr. Batistatos's employment would have been futile.

162. The SSCVA was the first party guilty of a substantial or material breach of the Employment Agreement.

## COUNT IV
*(Breach of Duty of Good Faith and Fair Dealing)*

163. Mr. Batistatos incorporates the allegations of paragraphs 1 through 162 above and, in addition, states that Defendant the SSCVA breached its duty of good faith and fair

dealing with Mr. Batistatos when it wrongfully and in bad faith terminated Mr. Batistatos's employment without cause.

164. The SSCVA owed a duty of good faith and fair dealing to Mr. Batistatos through their contractual relationships, specifically the Employment Agreement.

165. Mr. Batistatos fully performed the duties required of him under the Employment Agreement.

166. The SSCVA violated that duty of good faith and fair dealing when it wrongfully agreed to exchange Mr. Batistatos's termination for the dismissal of the City of Hammond's lawsuit and thereafter terminated Mr. Batistatos's employment for cause, without any actual basis, months before the expiration of the Employment Agreement.

167. The SSCVA knew that its termination of Mr. Batistatos's employment would significantly harm Mr. Batistatos's livelihood and career.

168. Mr. Batistatos has been damaged as a result of this bad faith termination of Mr. Batistatos's employment.

## COUNT V
*(Retaliation in violation of Indiana Whistleblower Laws, Ind. Code § 36-1-8-8)*

169. Mr. Batistatos incorporates the allegations of paragraphs 1 through 168 above and, in addition, states that the SSCVA illegally retaliated against Mr. Batistatos for reporting violations of a federal law or regulation, a state law or rule, and the misuse of public resources.

170. Mr. Batistatos reported a violation of a federal law or regulation (i.e., the CARES Act and related federal legislation); a state law or rule (i.e., the Indiana Open Door law); and the misuse of public resources.

171. Mr. Batistatos made these reports to all of the members of the Board, his supervisors, on June 24, 2021, and he discussed these reports on numerous occasions via email with the Board members.

172. Within days of reporting these violations of law, the SSCVA refused to engage in any further attempts to renegotiate Mr. Batistatos's employment because of these reports and terminated Mr. Batistatos's employment.

173. As a result of the SSCVA's wrongful retaliation against Mr. Batistatos, Mr. Batistatos suffered damages.

## COUNT VI
*(Tortious Interference with Contractual and Business Relationships)*

174. Mr. Batistatos incorporates the allegations of paragraphs 1 through 173 above and, in addition, states that Defendants the City of Hammond's, Thomas M. McDermott, Jr.'s, and Kevin C. Smith's (the "Hammond Defendants") conduct in this matter intentionally interfered with Mr. Batistatos's contractual and business relationships with the SSCVA.

175. The Hammond Defendants were aware of Mr. Batistatos's employment relationship with the SSCVA.

176. The Hammond Defendants induced the SSCVA to no longer renegotiate a new employment agreement with Mr. Batistatos and to terminate Mr. Batistatos's employment.

177. The Hammond Defendants did so by wrongfully bribing and/or exchanging an unlawful quid pro quo with the SSCVA. The Hammond Defendants offered to drop a pending lawsuit against the SSCVA if the SSCVA terminated Mr. Batistatos's employment.

178.     Almost immediately after Mr. Batistatos's employment was terminated, the Hammond Defendants dismissed the pending lawsuit against the SSCVA.

179.     The Hammond Defendants also wrongfully encouraged the SSCVA to violate the CARES Act and related federal legislation as well as engage in the misuse of public resources.

180.     As a result of the Hammond Defendants' wrongful interference with Mr. Batistatos's contractual and business relationships with the SSCVA, Mr. Batistatos has suffered damages.

## COUNT VII
### *(Defamation Per Se)*

181.     Mr. Batistatos incorporates the allegations of paragraphs 1 through 180 above and, in addition, states that the Hammond Defendants' conduct in this matter constitutes defamation per se.

182.     The actions of the Hammond Defendants were without legal privilege, legal justification, or excuse.

183.     Mr. McDermott and Mr. Smith, who were especially familiar with the law as attorneys, knowingly or recklessly communicated unfounded and untruthful statements in multiple episodes on a publicly available podcast, Left of Center Podcast ("LOCPOD"), about Mr. Batistatos.

184.     For example, as stated above in paragraph 123 of this Complaint, Mr. McDermott falsely accused Mr. Batistatos of "wield[ing] tax money like a weapon."

185.     Mr. McDermott falsely claimed, as stated above in paragraph 124 of this Complaint, that Mr. Batistatos engaged in "waste, fraud, and abuse" as well as falsely implied

criminal and/or illegal activity stating: "I'm not saying there's illegal stuff happening, but…
It's shady as hell. How about that? It's not illegal. It's shady as hell."

186. As stated above in paragraphs 125 and 126 of this Complaint, Mr. McDermott
furthermore, falsely stated that Mr. Batistatos "made up his own rules;" "pick[ed] his own
boss;" and "put his own boss on there [the SSCVA Board]."

187. As stated above in paragraph 126 of this Complaint, Mr. McDermott falsely
accused Mr. Batistatos of creating a "conspiracy" so that he could "make 330 grand on the
down low;" falsely claimed Mr. Batistatos engaged in "jackass behavior" because "he was
ignorant of the law and he was a punk;" falsely stated that Mr. Batistatos made "bullshit
backend deals;" and falsely denigrated Mr. Batistatos by labeling him a "[a] pompous want-
to-be elected official" who "deserves everything that is coming his way right now."

188. As stated in paragraphs 127 and 129 of this Complaint, Mr. McDermott made
several false assertions about Mr. Batistatos's salary, claiming that Mr. Batistatos made "two
and a half times" Mr. McDermott's salary as well as "two and a half more times than . . . the
mayor of Gary" and had a "330,000" "pretty solid salary" and a "$330,000 salary."

189. As stated in paragraphs 130 and 132 of this Complaint, Mr. McDermott
additionally falsely characterized his interactions with Mr. Batistatos, including falsely
claiming that Mr. Batistatos said, "'[N]o, if you won't let me speak on the stage. No. Screw
you, Mayor McDermott" as well as "[S]crew you. You won't let me speak on a microphone."

190. As stated in paragraph 131 of the Complaint, Mr. McDermott and Mr. Smith
falsely claimed that Mr. Batistatos "made up" the law and "interpreted the law to be
something different."

191.    As stated in paragraph 134 of this Complaint, Mr. McDermott again made several false statements about Mr. Batistatos, including that Mr. Batistatos "made up the law;" "spend[s] taxpayer money at his whim along with his Board;" "packed a board full of people that would approve his salary;" "spend $25,000 in one month" on his credit cards; "spent thousands of dollars at steak houses;" "spent $20,000 on a credit card bill in one month, and then he followed up the next month and spen[t] $15,000;" "wast[ed] taxpayer money at Ruth's Chris spending $6,000 on one meal."

192.    As stated in paragraph 134 of this Complaint, Mr. McDermott also falsely stated that Mr. Batistatos's "lawyers admitted he broke the law when they entered into the consent decree with us;" implied that Mr. Batistatos had paid for several "$200, $300 bottle of wines;" and implied that Mr. Batistatos buys state legislators "$300, $400 bottles of wine" and "$100 steak to court their vote."

193.    Mr. McDermott and Mr. Smith made these statements about Mr. Batistatos as Mayor and Corporation Counsel of the City of Hammond, respectively. Accordingly, the City of Hammond adopted these statements, and the Hammond Defendants acted in a concerted action in communicating the false statements about Mr. Batistatos.

194.    These communications by the Hammond Defendants were spoken maliciously, and they were made with the knowledge that they were false or with reckless disregard for whether they were true or false so as to indicate a conscious indifference to the rights of Mr. Batistatos.

195.    The acts and statements made by the Hammond Defendants were made with actual malice.

196.    The Hammond Defendants' communications and conduct regarding Mr. Batistatos caused injury to his professional and personal reputation, his employment relationship with the SSCVA, and his future prospective business opportunities.

197.    These defamatory communications included imputations of criminal conduct and/or misconduct in Mr. Batistatos's trade, profession, office, and/or occupation.

198.    The Hammond Defendants' communications and conduct regarding Mr. Batistatos thus constitute defamation per se.

## COUNT VIII
*(Defamation Per Quod)*

199.    Mr. Batistatos incorporates the allegations of paragraphs 1 through 198 above and, in addition, states that the Hammond Defendants' conduct in this matter constitutes defamation per quod.

200.    Mr. McDermott and Mr. Smith, who were especially familiar with the law as attorneys, knowingly or recklessly communicated unfounded and untruthful statements in multiple episodes on a publicly available podcast, Left of Center Podcast ("LOCPOD"), about Mr. Batistatos.

201.    For example, as stated above in paragraph 123 of this Complaint, Mr. McDermott falsely accused Mr. Batistatos of "wield[ing] tax money like a weapon."

202.    Mr. McDermott falsely claimed, as stated above in paragraph 124 of this Complaint, that Mr. Batistatos engaged in "waste, fraud, and abuse" as well as falsely implied criminal and/or illegal activity stating: "I'm not saying there's illegal stuff happening, but… It's shady as hell. How about that? It's not illegal. It's shady as hell."

203. As stated above in paragraphs 125 and 126 of this Complaint, Mr. McDermott furthermore, falsely stated that Mr. Batistatos "made up his own rules;" "pick[ed] his own boss;" and "put his own boss on there [the SSCVA Board]."

204. As stated above in paragraph 126 of this Complaint, Mr. McDermott falsely accused Mr. Batistatos of creating a "conspiracy" so that he could "make 330 grand on the down low;" falsely claimed Mr. Batistatos engaged in "jackass behavior" because "he was ignorant of the law and he was a punk;" falsely stated that Mr. Batistatos made "bullshit backend deals;" and falsely denigrated Mr. Batistatos by labeling him a "[a] pompous want-to-be elected official" who "deserves everything that is coming his way right now."

205. As stated in paragraphs 127 and 129 of this Complaint, Mr. McDermott made several false assertions about Mr. Batistatos's salary, claiming that Mr. Batistatos made "two and a half times" Mr. McDermott's salary as well as "two and a half more times than . . . the mayor of Gary" and had a "330,000" "pretty solid salary" and a "$330,000 salary."

206. As stated in paragraphs 130 and 132 of this Complaint, Mr. McDermott additionally falsely characterized his interactions with Mr. Batistatos, including falsely claiming that Mr. Batistatos said, "'[N]o, if you won't let me speak on the stage. No. Screw you, Mayor McDermott" as well as "[S]crew you. You won't let me speak on a microphone."

207. As stated in paragraph 131 of the Complaint, Mr. McDermott and Mr. Smith falsely claimed that Mr. Batistatos "made up" the law and "interpreted the law to be something different."

208. As stated in paragraph 134 of this Complaint, Mr. McDermott again made several false statements about Mr. Batistatos, including that Mr. Batistatos "made up the

law;" "spend[s] taxpayer money at his whim along with his Board;" "packed a board full of people that would approve his salary;" "spend $25,000 in one month" on his credit cards; "spent thousands of dollars at steak houses;" "spent $20,000 on a credit card bill in one month, and then he followed up the next month and spen[t] $15,000;" "wast[ed] taxpayer money at Ruth's Chris spending $6,000 on one meal."

209.    As stated in paragraph 134 of this Complaint, Mr. McDermott also falsely stated that Mr. Batistatos's "lawyers admitted he broke the law when they entered into the consent decree with us;" implied that Mr. Batistatos had paid for several "$200, $300 bottle of wines;" and implied that Mr. Batistatos buys state legislators "$300, $400 bottles of wine" and "$100 steak to court their vote."

210.    Mr. McDermott and Mr. Smith's communications regarding Mr. Batistatos were spoken or written maliciously and were made with the knowledge that they were false or with reckless disregard for whether they were true or false so as to indicate a conscious indifference to the rights of Mr. Batistatos.

211.    Mr. McDermott and Mr. Smith made these statements about Mr. Batistatos as Mayor and Corporation Counsel of the City of Hammond, respectively. Accordingly, the City of Hammond adopted these statements, and the Hammond Defendants acted in a concerted action in communicating the false statements about Mr. Batistatos.

212.    The acts and false statements made by the Hammond Defendants were made with actual malice.

213. The Hammond Defendants' communications and conduct regarding Mr. Batistatos caused injury to his professional and personal reputation, his employment relationship with the SSCVA, and his future prospective business opportunities.

214. In the event that the Hammond Defendants' communications and conduct toward Mr. Batistatos are not found to be defamation per se, then the Hammond Defendants' communications and conduct toward Mr. Batistatos constitute defamation per quod.

## COUNT IX
*(Damages for Concerted Action by and Among Defendants)*

215. Mr. Batistatos incorporates the allegations of paragraphs 1 through 214 above, and, in addition, states that the concerted action among some or all of the Defendants in this matter entitles Mr. Batistatos to additional damages.

216. All of the Defendants were aware that Mr. Batistatos had an employment agreement and an employment relationship with the SSCVA.

217. Defendants, in a concerted action amongst some or all of the Defendants, interfered with Mr. Batistatos's Employment Agreement and potential continuing employment relationship with the SSCVA.

218. Mr. Batistatos suffered damages when the Defendants, in a concerted action among some or all of the Defendants, worked together to deprive Mr. Batistatos of the benefits of his Employment Agreement, his continued employment with the SSCVA, his livelihood, and his career.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Speros A. Batistatos prays for a judgment in his favor against Defendants, and prays that the following relief be awarded:

(a) Grant a permanent injunction enjoining the SSCVA, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in age discrimination and any other employment practice, which discriminates on the basis of age.

(b) Order the SSCVA to institute and carry out policies, practices and programs which provide equal employment opportunities for individuals based on their age, and which eradicate the effects of its past and present unlawful employment practices.

(c) Order Defendants to make whole Mr. Batistatos by providing appropriate back pay and front pay for actual damages with pre-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to Mr. Batistatos's pecuniary losses.

(d) Order Defendants to make whole Mr. Batistatos by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including medical expenses, in amounts to be determined at trial.

(e) Order Defendants to make whole Mr. Batistatos by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices complained of herein, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation in amounts to be determined at trial.

(f) Order the SSCVA to reinstate Mr. Batistatos to an appropriate position, at an equal or improved salary.

(g) Order Defendants to pay Mr. Batistatos special damages, in amounts to be determined at trial.

(h) Order Defendants to pay damages to Mr. Batistatos for any and all injuries to his career, in amounts to be determined at trial.

(i) Award Mr. Batistatos the costs of this action including reasonable attorneys' fees and any such further relief as the Court may deem just, proper, and equitable.

(j) Award Mr. Batistatos all damages available to him for Defendants' breach of Mr. Batistatos's Employment Agreement.

(k)     Award Mr. Batistatos all damages available to him for Defendants' breach of the duty of good faith and fair dealing.

(l)     Award Mr. Batistatos all damages available to him for Defendants' retaliation against him in violation of Indiana Whistleblower Laws, Ind. Code § 36-1-8-8.

(m)     Award Mr. Batistatos all damages available to him for Defendants tortious interference with Mr. Batistatos's contractual and business relationships.

(n)     Award Mr. Batistatos all damages available to him for Defendants' defamation of Mr. Batistatos.

(o)     Grant such further relief as the Court deems necessary and proper in the public interest.

## XI.     <u>RESERVATION OF RIGHTS</u>

Pursuant to the rules of pleading and practice, Plaintiff reserves the right to assert additional violations of federal and state law.

## XII.     <u>JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*s/ Sandra L. Blevins*
Sandra L. Blevins, Attorney No. 19646-49
Jamie A. Maddox, Atty. No. 26522-49
Courtney E. Endwright, Attorney No. 30557-49
Chad H. Holler, Atty. No. 35253-49

*Attorneys for Plaintiff Speros A. Batistatos*

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail:  litigation@betzadvocates.com